776 S.E.2d 387

The STATE, Respondent,

v.

Kareem HARRY, Appellant.

Appellate Case No. 2013–000336.
No. 5332.

Court of Appeals of South Carolina.

Heard May 5, 2015.
Decided July 22, 2015.
Rehearing Denied Sept. 17, 2015.

Meliah Bowers Jefferson, of Wyche Law Firm, of Greenville, and Chief Appellate Defender, Robert Michael Dudek, of Columbia, for appellant.

Attorney General, Alan McCrory Wilson, Chief Deputy Attorney General, John W. McIntosh, Senior Assistant Deputy Attorney General, Donald J. Zelenka, and Assistant Attorney General, J. Anthony Mabry, all of Columbia, and Solicitor Jimmy A. Richardson, II, of Conway, for respondent.

KONDUROS, J.

Kareem Harry appeals his murder conviction under the hand of one is the hand of all theory of accomplice liability. He argues the circuit court erred in denying his motion for directed verdict, as the State failed to present any direct or substantial circumstantial evidence he acted in concert with Saire Castro, his associate and friend, who admitted shooting the victim and pled guilty to voluntary manslaughter. We affirm.

## FACTS/PROCEDURAL BACKGROUND

Harry was dating a woman, Ashley Bledsoe, with whom he had a tumultuous relationship. According to Bledsoe, she and Harry dated for about eight or nine months, and, for the two weeks prior to the shooting in this case, they lived together in the apartment Bledsoe shared with a roommate, Evelyn. Bledsoe testified Harry became abusive to her. On February 26, 2011, Harry and Bledsoe fought, and Bledsoe called the police. When police arrived, Harry fled. The following day, Bledsoe met the victim, Kevin Bowens, through her roommate. Bowens took Bledsoe and Evelyn to dinner, and they all went to a club together. Bowens spent that night at Bledsoe's apartment. A friend of Bledsoe and Harry, Sage McPhail, owned a truck and helped move Harry's things out of her apartment the next day. McPhail took everything except a large plasma television to the home where Harry was staying with the mother of his children. According to Bledsoe, she had given the television to Bowens, and Bowens said he would pay her for it.

Harry contacted Bledsoe indicating he wanted his television or the money for it. Bledsoe told Harry she had sold it to a female friend. She texted Bowens asking for the money saying the television had belonged to a female friend who was demanding the money. Bowens did not return the television or pay Bledsoe. Eventually, Bledsoe told Harry the truth about what happened with the television. According to Bledsoe, Harry needed the television or the money the following day to pay probation fees that were due. While Bledsoe and Harry were talking on the phone, he told her to stop where she was, and he would come get her. Bledsoe, riding with Evelyn at the time, stopped at Waccamaw Hospital, and

Harry picked her up in McPhail's red truck.[1] The two drove to Tommy Byrne's apartment, approximately 16.3 miles away, even though Bowens's house was in the Kings Grant subdivision only 2.9 miles away from the hospital. According to Byrne, Harry came into the apartment and asked to see Castro. Castro and Harry had a five to eight minute conversation in the living room that Byrne could not overhear because he was in the kitchen with his father, who was preparing dinner. Harry then left, and Castro followed, asking Byrne if he wanted to go for a ride. Byrne testified that as they were leaving, Castro went back to the kitchen, where he kept his gun on top of a cabinet. Although neither Harry nor Byrne saw Castro retrieve the gun, Byrne testified it was well-known Castro had a firearm.[2]

Castro and Byrne, driving separately, followed Bledsoe and Harry to Bowens's neighborhood. Once there, Harry, Castro, and Byrne got out of their vehicles, and Bowens entered the yard area near his garage. According to Bowens's girlfriend, with whom he shared the home, the vehicles sped down the street in front of their house and pulled into the middle of the yard. Harry asked several times about getting the television back, but Bowens indicated he was not going to return the television. According to Bowens's girlfriend and neighbors, although it was unclear exactly what the parties were saying, the conversation was loud. Harry told Bledsoe to get out of the truck, and she stated Bowens had "stolen" the television. Harry instructed Bledsoe to get back in the truck, and Castro shot Bowens three times. Castro testified he saw Bowens reach for a gun he had in his waistband, the outline of which was visible through his shirt, and he shot in self-defense. Byrne indicated Bowens did not reach for his gun, and Bowens's girlfriend and a neighbor testified the gun was still in Bowens's waistband after he was shot.

---

1. According to McPhail, he did minor automotive repair work for friends and he had Harry's sport utility vehicle (SUV) to repair its brakes. McPhail testified he left his truck for Harry to drive while he worked on the SUV.

2. Castro had been arrested for having drugs and guns in a vehicle a few weeks earlier. Because his child was also in the vehicle, the Department of Social Services required Castro and the child's mother to reside separately from the child, and they were staying with Byrne.

Harry jumped into the truck with Bledsoe and instructed her to drive away. After a brief chase, Bledsoe stopped the vehicle and surrendered. Harry fled and police later captured him.

Castro pled guilty to voluntary manslaughter, and Harry was tried for murder under the hand of one is the hand of all theory of accomplice liability. At trial, Harry moved for directed verdict, arguing the State failed to present any direct or substantial circumstantial evidence Harry conspired or planned with Castro to murder Bowens over the television or to accomplish any illegal purpose. The circuit court denied Harry's motion, and the jury convicted him. The circuit court sentenced him to thirty-one years' imprisonment. This appeal followed.

**STANDARD OF REVIEW**

 "In cases where the State has failed to present evidence of the offense charged, a criminal defendant is entitled to a directed verdict." *State v. Hepburn*, 406 S.C. 416, 429, 753 S.E.2d 402, 408 (2013). "During trial, [w]hen ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *Id.* at 429, 753 S.E.2d at 408–09 (alteration by court) (internal quotation marks omitted). "The trial court should grant the directed verdict motion when the evidence merely raises a suspicion that the accused is guilty, as [s]uspicion implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *Id.* at 429, 753 S.E.2d at 409 (alteration by court) (internal quotation marks omitted). "On the other hand, a trial judge is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." *Id.* (internal quotation marks omitted).

] "On appeal, [w]hen reviewing a denial of a directed verdict, this [c]ourt must view the evidence and all reasonable inferences in the light most favorable to the [S]tate." *Id.* (first alteration by court) (internal quotation marks omitted). "If the [S]tate has presented any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, this [c]ourt must affirm the trial court's decision to submit the case to the jury." *Id.* (internal quotation marks omitted). "Circumstantial evidence

... gains its strength from its combination with other evidence, and all the circumstantial evidence presented in a case must be considered together to determine whether it is sufficient to submit to the jury." *State v. Rogers,* 405 S.C. 554, 567, 748 S.E.2d 265, 272 (Ct.App.2013).

## LAW/ANALYSIS

█ Harry maintains the circuit court erred in failing to direct a verdict of acquittal when the State did not present direct or substantial circumstantial evidence proving him guilty of murder under the hand of one is the hand of all theory of accomplice liability. We disagree.

 "The doctrine of accomplice liability arises from the theory that the hand of one is the hand of all." *State v. Reid,* 408 S.C. 461, 472, 758 S.E.2d 904, 910 (2014) (internal quotation marks omitted). "Under this theory, one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose." *Id.* "Where two persons combine to commit an unlawful act and in its execution a homicide is committed as a probable or natural consequence thereof, all present and participating in the unlawful act are as guilty as the one who committed the fatal act." *State v. Fields,* 314 S.C. 144, 146 n. 1, 442 S.E.2d 181, 182 n. 1 (1994).

> Except in rare situations, a person committing an unlawful act is legally responsible for all natural or necessary consequences thereof. One combining and confederating with others to accomplish an illegal purpose is criminally liable for everything done by either him or his confederates which follows incidentally in the execution of a common design as one of the probable and natural consequences, *though not intended as a part of the original design or common plan.*

*State v. McCall,* 304 S.C. 465, 469–70, 405 S.E.2d 414, 416 (Ct.App.1991), *overruled on other grounds by Brightman v. State,* 336 S.C. 348, 520 S.E.2d 614 (1999).

> The common purpose may not have been to kill and murder, but if it was unlawful, as, for instance, to break in, and steal, and in the execution of this common purpose a homicide is committed by one, as a probable or natural consequence of the acts done in pursuance of the common design, then all

present participating in the unlawful common design are as guilty as the slayer.

*State v. Cannon,* 49 S.C. 550, 555, 27 S.E. 526, 530 (1897).

■ The hand of one is the hand of all theory of guilt is more often termed the natural consequences doctrine in other jurisdictions. *See State v. Delestre,* 35 A.3d 886, 896 n. 11 (R.I.2012) (referencing the acceptance of this theory of aiding and abetting by the Second Circuit, Ninth Circuit, Eleventh Circuit, District of Columbia, and South Carolina). "In order to establish the parties agreed to achieve an illegal purpose, thereby establishing presence by pre-arrangement, the State need not prove a formal expressed agreement, but rather can prove the same by circumstantial evidence and the conduct of the parties." *State v. Gibson,* 390 S.C. 347, 354, 701 S.E.2d 766, 770 (Ct.App.2010).

While not controlling, we find the facts in *People v. Miller,* 2008 WL 1899560 (Cal.Ct.App.2008), to be analogous to the facts of this case and its disposition, therefore, informative. In that case, Miller asked another man, Baillie, to accompany him to confront a third man (Victim) regarding Victim's refusal to provide Miller's sister with a bid for installing an air conditioner. *Id.* at *1. The prosecution argued Miller anticipated getting into a fight with Victim and wanted Baillie to go with him to back him up. *Id.* Miller knew Baillie normally carried a gun; Baillie was willing to use his gun; Baillie held resentment toward Victim; and Baillie would fight, if Miller needed help. *Id.* Miller was convicted of murder, and the appellate court affirmed that conviction founded upon the natural consequences doctrine. *Id.* at *3.

This court has similarly held circumstantial evidence establishing a defendant called for "backup" from someone with a gun in anticipation of an altercation could withstand a directed verdict motion. In *Gibson,* a disagreement between parties at a bar ended in one man's shooting death. 390 S.C. at 351–53, 701 S.E.2d at 768–69. In determining under the hand of one hand of all theory, the defendant, Adams Gibson, was not entitled to a directed verdict, this court found Adams called his brother, Jacques, to the bar and, instead of leaving with him, called Jacques inside the bar to point out the men with whom he had been arguing. *Id.* at 355, 701 S.E.2d at 770.

Furthermore, [a witness] testified Adams went to Jacques's car and retrieved a gun moments before the shooting and although they left separately, both men fled the scene. *Id.* The court concluded this evidence was sufficient to withstand Adams's directed verdict motion.

> Here, at minimum, the evidence creates the inferences that Adams informed Jacques of the situation, that the reason for the call may not have been solely for the purpose of removing Adams from the scene, and that Adams was aware a firearm was available for him to retrieve from Jacques's white sedan. When viewed in the light most favorable to the State, the circumstantial evidence in this case infers Adams and Jacques may have acted in concert in assaulting the men from Winnsboro.

*Id.*

In the present case, the circuit court did not err in sending Harry's case to the jury. The State presented substantial circumstantial evidence from which the jury could infer Harry planned with Castro to confront Bowens regarding the television and his recent encounter with Bledsoe and assault him or otherwise take the television by force. The record demonstrates Bledsoe and Harry went out of their way to pick up Castro, and after a lengthy private discussion, Castro, an individual known to carry a gun, followed Bledsoe and Harry to Bowens's home. The group did not arrive at his residence by happenstance but by coordinated effort led by Harry. Once they conspired to confront a known drug dealer,[3] who approached them with a gun in his waistband, the natural consequences that flowed from that planned altercation are the responsibilities of both men. Additionally, Harry, Bledsoe, Castro, and Byrne all fled the scene together, with Harry and Bledsoe absconding in a borrowed vehicle. Viewing all inferences in the light most favorable to the State, we find the circuit court did not err in denying Harry's motion for directed verdict. Whether the evidence presented rose to the

---

3. Bowens's girlfriend testified Bowens sold drugs. McPhail testified he purchased marijuana and cocaine from Harry on different occasions. Harry testified he spoke to Bowens on the phone prior to going to his house and determined they "had people in common" and the area where they live is a small place where people know each other.

quantum of proof required for conviction was a question for the jury. Therefore, the ruling of the circuit court is

**AFFIRMED.**

THOMAS and GEATHERS, JJ., concur.