803 S.E.2d 272

**The STATE, Respondent,**

v.

**Kareem HARRY, Petitioner.**

**Appellate Case No. 2015-002161**
**Opinion No. 27724**

Supreme Court of South Carolina.

Heard November 30, 2016
Filed July 19, 2017

Meliah Bowers Jefferson, of Wyche, P.A., of Greenville, and Chief Appellate Defender Robert Michael Dudek, of Columbia, for Petitioner.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General J. Anthony Mabry, all of Columbia; and Solicitor Jimmy A. Richardson, II, of Conway, for Respondent.

JUSTICE KITTREDGE:

Petitioner Kareem Harry was convicted of murder, under the theory that the "hand of one is the hand of all," for his role in a failed attempt to recover a television. The court of appeals affirmed, holding the trial court properly denied Petitioner's motion for a directed verdict. *State v. Harry*, 413 S.C. 534, 776 S.E.2d 387 (Ct. App. 2015). We issued a writ of certiorari to review the court of appeals' decision and now affirm.

## I.

This tragic story culminates with an attempt by Petitioner and his enlisted cohorts to retrieve Petitioner's forty-seven-inch plasma-screen television from Kevin Bowens (Victim). Victim was shot and killed on his property by one of Petitioner's accomplices during the confrontation. The State contends the evidence demonstrates that Petitioner intended to retrieve his television by any means necessary, including the use of force. According to the State, Victim's death was therefore a natural and foreseeable consequence of Petitioner's plan to retrieve his television and, under the theory of accomplice liability that says the hand of one is the hand of all, Petitioner is guilty of murder. Petitioner counters that he only wanted to peacefully reclaim his television, he had no idea his accomplice was armed, and he actually tried to be a calming influence when the situation became tense. In light of the differing inferences that may be drawn from the evidence, we emphasize that because we are reviewing a directed verdict motion, we are required to " 'view[ ] the evidence and all reasonable

inferences in the light most favorable to the State.'" *State v. Bennett*, 415 S.C. 232, 235, 781 S.E.2d 352, 353 (2016) (quoting *State v. Butler*, 407 S.C. 376, 381, 755 S.E.2d 457, 460 (2014)).

## A.

The chain of events leading to Victim's death began about nine months before the murder. During this time, Petitioner had an abusive, on-again, off-again romantic relationship with Ashley Bledsoe, with whom he temporarily resided in Surfside Beach. The weekend before the shooting, police responded to Bledsoe's residence to investigate allegations that Petitioner had assaulted Bledsoe during an argument. Petitioner fled through a bedroom window, leaving behind a coat in which the police found cocaine. Petitioner also left behind personal belongings, including his television.

The day after her argument with Petitioner, Bledsoe met Victim, a drug dealer who lived in Murrells Inlet, and the two spent the night together at Bledsoe's apartment. The following morning, Bledsoe agreed to give Petitioner's television to Victim in exchange for $400. Before leaving Bledsoe's apartment, Victim loaded the television into the backseat of his car, promising to return shortly with the cash. Victim did not return and never paid Bledsoe for the television.

By all accounts the television was lightweight. Victim was able to lift it, load it into the backseat of his sedan, and unload it at his home without any assistance. Victim's girlfriend also testified that the television was not heavy, it did not require more than one person to lift, and she had been able to move it by herself. As for how Victim had obtained the television, he explained to his girlfriend that "he had bought it off of somebody.... [H]e had given them a little bit of money for it and that he had bought an ounce of weed at a really good price to make up the difference and that he still owed a little bit of money on it...."

At some point, Bledsoe's landlord learned police had found drugs in Bledsoe's apartment and terminated the lease. Bledsoe was required to vacate the premises and remove all belongings. Bledsoe relayed the fact of the lease termination to Petitioner, who had personal property in the apartment. Petitioner asked Sage McPhail, a drug customer of his who owned a pickup truck, to help move Petitioner's belongings

from Bledsoe's apartment.[1] The day before the shooting, Bledsoe met McPhail at her apartment and gave McPhail all of Petitioner's belongings—except, of course, for Petitioner's television, which she had sold to Victim.[2]

When Petitioner discovered his television was not among the items recovered from Bledsoe's apartment, he contacted Bledsoe and demanded that she return the television or pay him for it. Frightened that Petitioner might become violent toward her if he learned of her romantic encounter with Victim, Bledsoe lied and told Petitioner she had sold the television to a female friend for $400. Petitioner reiterated his demand that Bledsoe return the television or give him the $400.

The following day, Petitioner called and texted Bledsoe on ten separate occasions to inquire about the television, but Bledsoe never answered or responded. Petitioner thereafter sent Bledsoe a text message stating, "I'm going to call the police if you don't give me my TV." Desperate to appease Petitioner, Bledsoe texted Victim numerous times asking for the money and explaining that the television belonged to a friend, who was demanding payment and threatening to call the police. At some point, Victim texted Bledsoe, "Stop letting that police shit scare you," but eventually Victim stopped responding to Bledsoe's text messages and telephone calls. Unable to get any response from Victim, Bledsoe told Petitioner the truth about the person to whom she sold the television and provided Petitioner with Victim's telephone number.

Around 7:00 p.m. on the evening of the shooting, Bledsoe was running errands with her roommate in Murrells Inlet when she received a call from Petitioner, who demanded that she pull over immediately so he could pick her up and she could show Petitioner where Victim lived. Petitioner's plan, as noted, was to retrieve either the television or the $400 Victim promised to pay for it.[3] Bledsoe's roommate, who was driving,

1. McPhail occasionally performed odd jobs for Petitioner in exchange for cocaine or marijuana.

2. There was also evidence Victim took drugs from Bledsoe's apartment that belonged to Petitioner.

3. Petitioner apparently had a probation meeting the following morning and was in need of funds to pay probation-related fees.

pulled over in the parking lot of Waccamaw Hospital, located just 2.9 miles from Victim's home, and a few moments later, Petitioner, who was driving McPhail's truck, picked up Bledsoe.[4] Instead of proceeding directly to Victim's nearby home, Petitioner instead drove 16.3 miles to the Myrtle Beach home of his friends, and fellow drug dealers, Tommy Byrne and Saire Castro.

Upon arriving at Byrne and Castro's apartment, Petitioner went inside while Bledsoe waited in the car. When Petitioner entered the home, Byrne and Castro were at the kitchen table, while Byrne's father was cooking dinner. Petitioner summoned Castro into the living room and the two had a five- to eight-minute conversation, which Byrne could not overhear because he remained seated at the kitchen table.[5] Castro was told that, along with Petitioner's television, Victim had also stolen some drugs belonging to Petitioner that Petitioner had stored in Bledsoe's apartment (of which it appears Bledsoe was unaware). Immediately following the conversation with Petitioner, Castro returned to the kitchen, asked Byrne if he wanted to "take a ride," and retrieved his (Castro's) handgun from above a kitchen cabinet. Although there is no direct evidence that Petitioner or Byrne saw Castro retrieve his handgun, they both saw him go into the kitchen, and the evidence established it was well-known that Castro carried a gun.[6]

Petitioner then returned to the pickup truck where Bledsoe was waiting, and Byrne and Castro got into Castro's sedan, with Castro behind the wheel. With Petitioner leading the way

---

4.  Earlier in the day, McPhail agreed to perform some minor automotive repairs on Petitioner's SUV in exchange for cocaine; since McPhail had to take the SUV to his uncle's shop in Loris (forty-five minutes away) to perform the work, McPhail left his truck for Petitioner to drive in the meantime.

5.  Byrne also testified that earlier that evening he had taken several Xanax pills (for which he did not have a prescription), and on a scale of one to ten, he was "about a seven" in terms of his level of intoxication.

6.  Several weeks prior to the shooting, Castro was arrested and charged with unlawful conduct toward a child when police found two semi-automatic guns and drugs in the car in which he was traveling with his child. Petitioner admitted he was aware that Castro sold drugs and that just a few weeks prior to the shooting Castro had been arrested with guns and drugs.

in the pickup, the two vehicles caravanned 11.6 miles to Victim's home in the Burgess area of Murrells Inlet. During the car ride, Castro informed Byrne the purpose of the ride was "to go collect a TV."

At some point prior to arriving at Victim's home, Petitioner sent Victim a text message stating, "Meet me in Burgess." Several minutes later, Petitioner called Victim's cell phone and the two had a brief conversation during which Petitioner made clear his intention to retrieve the television. According to Victim's girlfriend, after receiving Petitioner's telephone call Victim became agitated and was unable to finish eating dinner. Instead, Victim got up from the dinner table and went into the master bedroom.

A few minutes later, Victim's girlfriend looked out the window and saw Petitioner's caravan arriving at the couple's home. She immediately rushed to the master bedroom to tell Victim that two vehicles had pulled into the yard. Victim tucked a handgun in the front of his pants and told his girlfriend he "would take care of it." Victim walked out into the driveway, leaned up against the side of his parked car, and stood with his arms crossed and the gun visible in his waistband.

Although Victim was visibly armed, Petitioner and his cohorts exited their vehicles and formed a semi-circle around Victim. Witnesses could not make out precisely what was said, but the ensuing conversation was loud and confrontational.

By all accounts, Petitioner inquired several times about the television, and Victim stated he had neither the television nor any money to give Petitioner. At some point, Bledsoe got out of the truck and confronted Victim about "stealing" the television. After it became obvious that Petitioner was not going to obtain either his television or any money, Petitioner instructed Bledsoe to get back into the truck and "gave [Victim a] head nod." Castro then pulled out his gun and shot Victim three times.

Immediately after the shooting, Petitioner jumped into the passenger side of the truck, pushed Bledsoe into the driver's seat, and instructed her to drive away. Approximately one mile from the scene of the shooting, police spotted the fleeing caravan, and after a brief chase, Bledsoe pulled over and

surrendered. However, before she could fully stop, Petitioner exited the vehicle through the passenger door and fled on foot to the home of a friend who lived nearby. Petitioner used the friend's telephone to call his brother for a ride to Petitioner's ex-girlfriend's house in Socastee.

Meanwhile, McPhail had completed the repairs to Petitioner's SUV and had driven to Petitioner's ex-girlfriend's home to return the SUV and retrieve his pickup. When he got there, his truck was gone and no one was home, so he leaned the seat back and fell asleep while waiting for Petitioner to arrive with the pickup. McPhail awoke to the sound of Petitioner knocking on the SUV's window, and Petitioner informed McPhail that "the cops got your truck." Petitioner instructed his brother to drop McPhail off at Byrne and Castro's apartment so McPhail could give Castro a ride out of town. Before leaving, Petitioner instructed McPhail that "you ain't seen me."

### B.

It is undisputed that Castro shot Victim, but because Petitioner was the only one who had any motive to confront Victim, the State theorized that he was the mastermind behind the incident. Thus, Petitioner, Castro, Byrne, and Bledsoe were all charged with murder under the theory that the hand of one is the hand of all.[7] Castro pled guilty to voluntary manslaughter and was sentenced to thirty years in prison, and Byrne and Bledsoe agreed to testify on behalf of the State at Petitioner's trial.

At the close of the State's case, Petitioner moved for a directed verdict, arguing the State produced no evidence of a common design to undertake any illegal purpose. After the trial court denied Petitioner's motion, Castro and Petitioner both testified in Petitioner's defense; however, their accounts of the incident differed from each other and from the other witnesses in numerous key aspects. Petitioner was convicted by the jury and sentenced to thirty-one years in prison. The court of appeals affirmed. *Harry*, 413 S.C. at 542–43, 776 S.E.2d at 392.

---

7. McPhail was charged with accessory after the fact to murder.

## II.

Petitioner contends the court of appeals erred in affirming the denial of his directed verdict motion, arguing that the State failed to produce substantial circumstantial evidence that Petitioner planned to confront or assault Victim, or otherwise intended any unlawful action that would foreseeably result in a violent confrontation. We disagree.

## A.

In reviewing the denial of a motion for a directed verdict, the Court must view the evidence in a light most favorable to the State. *E.g., Bennett*, 415 S.C. at 235, 781 S.E.2d at 353 (citation omitted). "The Court's review is limited to considering the existence or nonexistence of evidence, not its weight." *Id.* "When the evidence submitted raises a mere suspicion that the accused is guilty, a directed verdict should be granted because suspicion implies a belief of guilt based on facts or circumstances which do not amount to proof." *Id.* at 236, 781 S.E.2d at 353. "Nevertheless," in reviewing the denial of a directed verdict motion, we are "not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis." *Id.* at 236, 781 S.E.2d at 354.

Indeed, this Court emphasized in *Bennett* that "the lens through which a court considers circumstantial evidence when ruling on a directed verdict motion is distinct from the analysis performed by the jury." *Id.* (citing *State v. Littlejohn*, 228 S.C. 324, 89 S.E.2d 924 (1955)). "Within the jury's inquiry, 'it is necessary that every circumstance relied upon by the state be proven beyond a reasonable doubt....'" *Id.* (quoting *Littlejohn*, 228 S.C. at 328, 89 S.E.2d at 926).

> However, when ruling on a directed verdict motion, the trial court views the evidence in the light most favorable to the State and must submit the case to the jury if there is "any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced."

*Id.* at 236–37, 781 S.E.2d at 354 (quoting *Littlejohn*, 228 S.C. at 329, 89 S.E.2d at 926). "Therefore, although the *jury* must consider alternative hypotheses, the *court* must concern itself solely with the existence or non-existence of evidence from

which a jury could reasonably infer guilt." *Id.* at 237, 781 S.E.2d at 354.

## B.

■ " 'Under the hand of one is the hand of all theory [of accomplice liability], one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose.' " *State v. Thompson*, 374 S.C. 257, 261–62, 647 S.E.2d 702, 704–05 (Ct. App. 2007) (alteration in original) (quoting *State v. Condrey*, 349 S.C. 184, 194, 562 S.E.2d 320, 324 (Ct. App. 2002)) (internal quotation marks omitted). "Mere presence and prior knowledge that a crime was going to be committed, without more, is insufficient to constitute guilt." *Id.* at 262, 647 S.E.2d at 705. "However, 'presence at the scene of a crime by pre-arrangement to aid, encourage, or abet in the perpetration of the crime constitutes guilt as a [principal].' " *Id.* (alteration in original) (quoting *State v. Hill*, 268 S.C. 390, 395–96, 234 S.E.2d 219, 221 (1977)).

## III.

■ Therefore, to withstand Petitioner's directed verdict motion in the trial of this case, the State was required to produce evidence of Petitioner's presence at the scene of the shooting as a result of a prior arranged plan to undertake an illegal act, if necessary, to retrieve the television. We agree with the court of appeals that the State presented sufficient evidence to survive the directed verdict motion. The excellent opinion of the court of appeals analyzed the evidence appropriately in light of the applicable standard of review. The dissent cites the proper standard of review, but rejects it in application, preferring instead to recast the evidence in a light favorable to Petitioner.

The State presented evidence that Petitioner had a history of violence and that Victim—who, like Petitioner, was a drug dealer—had not only slept with Petitioner's on-again, off-again girlfriend, but had also taken a television and drugs belonging to Petitioner without paying for them. The State further produced evidence that just before the shooting, instead of proceeding the 2.9 miles to Victim's house immediately upon picking up Bledsoe, Petitioner instead traveled 16.3 miles to

recruit Castro, who was known to carry a gun, and Byrne to accompany him as backup when he confronted Victim,[8] despite the fact that the television was not so large or heavy that it required more than one person to carry.

After Petitioner showed up unannounced at Byrne and Castro's home and conferred with Castro, Castro immediately armed himself and asked Byrne to join them. Petitioner then led the caravan to Victim's house. Prior to arriving at Victim's home, Petitioner texted and called Victim to the point that Victim was too upset to finish eating dinner. Once the caravan arrived at Victim's home, Petitioner, Castro, and Byrne continued with Petitioner's mission, notwithstanding the fact they could tell Victim was armed. Further, even though Petitioner knew both sides of this confrontation were armed, his tone toward Victim was loud and heated, and according to Castro's own testimony, Petitioner "gave . . . [a] head nod" just prior to Castro firing the fatal shots. Moreover, Castro and Petitioner left their vehicles running as they confronted Victim. Following the shooting, Petitioner shoved Bledsoe into the driver's seat and forced her to drive the getaway vehicle, from which Petitioner fled on foot after it was stopped by the police.

Even without considering Petitioner's flight,[9] the evidence yielded a reasonable series of inferences consistent with the State's theory—that Petitioner devised a plan to retrieve, by force if necessary, his television from Victim, a known drug dealer whom Petitioner and his accomplices knew was armed before exiting their vehicles. The State therefore presented sufficient evidence that Petitioner was engaged in a scheme to commit an illegal act, the result of which was Victim's shooting death, and the trial court properly denied Petitioner's motion for a directed verdict.

## IV.

Because the court of appeals properly determined that the State presented sufficient evidence to withstand Petitioner's

---

8. Petitioner then had to backtrack 11.6 miles to get from Byrne and Castro's apartment to Victim's home.

9. "Evidence of flight has been held to constitute evidence of guilty knowledge and intent." *State v. Beckham*, 334 S.C. 302, 315, 513 S.E.2d 606, 612 (1999) (citing *State v. Thompson*, 278 S.C. 1, 10–11, 292 S.E.2d 581, 587 (1982)).

motion for a directed verdict, we affirm the court of appeals' decision.

**AFFIRMED.**

FEW, J., and Acting Justice Costa M. Pleicones, concur. HEARN, J., dissenting in a separate opinion in which BEATTY, C.J., concurs.

JUSTICE HEARN:

I respectfully dissent. Because the record contains no evidence of an illegal plan or purpose, I do not believe Appellant Harry's conviction under the theory of "hand of one is the hand of all" can stand. Therefore, I would reverse the trial court's denial of Harry's motion for directed verdict.

Harry contends the court of appeals erred in affirming the denial of his directed verdict motion, arguing that the State failed to produce substantial circumstantial evidence that he planned to confront or assault the Victim or otherwise intended any unlawful action that would foreseeably result in a homicide. I agree.

A defendant is entitled to a directed verdict when the State fails to produce evidence tending to prove *every* element of the offense charged. *State v. Brannon*, 388 S.C. 498, 501, 697 S.E.2d 593, 595 (2010). In reviewing the denial of a directed verdict, "[t]he Court's review is limited to considering the existence or nonexistence of evidence, not its weight." *State v. Bennett*, 415 S.C. 232, 235–36, 781 S.E.2d 352, 353–54 (2016) (citing *State v. Cherry*, 361 S.C. 588, 593, 606 S.E.2d 475, 478–79 (2004)). "When the evidence submitted raises a mere suspicion that the accused is guilty, a directed verdict should be granted because suspicion implies a belief of guilt based on facts or circumstances which do not amount to proof." *Id.* at 236, 781 S.E.2d at 353–54 (citing *State v. Hepburn*, 406 S.C. 416, 429, 753 S.E.2d 402, 409 (2013)). Moreover, when co-defendants are not tried jointly and both the appellant and his co-defendant testify in his defense, an appellate court must consider all the evidence in the record to determine whether the trial judge erred in denying the appellant's motion for a directed verdict. *State v. Phillips*, 416 S.C. 184, 195–97, 785

S.E.2d 448, 453–54 (2016) (explaining the waiver rule adopted in *Hepburn*).

Harry was charged with and convicted of murder based on the accomplice theory, commonly referred to as "hand of one is the hand of all." Under this theory, " 'one who joins with another to accomplish an *illegal purpose* is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose.' " *State v. Mattison*, 388 S.C. 469, 479, 697 S.E.2d 578, 584 (2010) (quoting *State v. Condrey*, 349 S.C. 184, 194, 562 S.E.2d 320, 324 (Ct. App. 2002)) (emphasis added). In order to be guilty under this theory a defendant must "be present at the scene of the crime and intentionally, or through a common design, aid abet, or assist in the commission of that crime through some overt act." *Id.* (quoting *State v. Langley*, 334 S.C. 643, 648–49, 515 S.E.2d 98, 101 (1999)) (internal quotations omitted). Additionally, a defendant " 'must be chargeable with knowledge of the principal's criminal conduct.' " *Id.* at 480, 697 S.E.2d at 584 (quoting *State v. Leonard*, 292 S.C. 133, 137, 355 S.E.2d 270, 272 (1987)); *see also State v. Reid*, 408 S.C. 461, 473, 758 S.E.2d 904, 910 (2014) ("[P]roof of mere presence is insufficient, and the State must present evidence the participant knew of the principal's criminal conduct."). This Court has explained that in order for a defendant to have the requisite knowledge:

> "the alleged accomplice must have acted with the intention of encouraging and abetting the commission of the homicide, or, at least that the commission of the murder by the principal must have been a *reasonably foreseeable consequence* of the defendant's actions."

*Mattison*, 388 S.C. at 484, 697 S.E.2d at 586 (quoting 40 Am. Jur. 2d *Homicide* § 26 (2010)) (emphasis added).

I am troubled by the State's application of the "hand of one is the hand of all" theory to this case. This theory of accomplice liability is most frequently utilized in the context of burglary or robbery cases in which there is typically strong circumstantial evidence of a plan to perpetrate an illegal act. *See, e.g., Barber v. State*, 393 S.C. 232, 234–36, 712 S.E.2d 436, 437–38 (2011) (Barber was convicted of criminal conspiracy, murder, and possession of a firearm during commission of a

violent crime *inter alia* for planning and perpetrating a burglary with three other men, although there were only two weapons and it was uncertain which two of the defendants were actually armed and which one shot and killed the victim.); *Rivera v. State*, 382 S.C. 606, 608, 677 S.E.2d 596, 597 (2009) (Rivera was charged with murder and armed robbery under the "hand of one is the hand of all" theory where Rivera did not actively participate in the robbery and murder, but "accompanied the active participants to the scene with knowledge that they intended to commit the robbery."). After an extensive review of the cases involving accomplice theory, I am unaware of any case in which a defendant was convicted under similar circumstances to those present in this case, *i.e.*, in the course of retrieving property which was rightfully his.

Furthermore, I believe the facts in *People v. Miller*—an unpublished opinion from the California Fourth District Court of Appeal—are distinguishable and the court of appeals' reliance on that case misplaced. *See State v. Harry*, 413 S.C. 534, 541–42, 776 S.E.2d 387, 391–92 (Ct. App. 2015) (citing *Miller*, No. E040249, 2008 WL 1899560 (Cal. Ct. App. April 30, 2008)). The defendant in *Miller* admitted his purpose in going to the victim's home was to confront the victim, fully anticipating there would be an altercation. There, the defendant Miller was angry with the victim for refusing to give Miller's sister a quote on a new air conditioner. When Miller went to the victim's house to confront him, the two argued loudly, cursing at one another, and eventually began fighting. During the altercation, Miller's friend, Baillie, pulled his gun and fired seven shots, killing the victim and seriously injuring another bystander. A few days later, Miller turned himself in and gave a videotaped statement to the police. In his statement, Miller admitted that his purpose in going to the victim's house was to confront the victim and he anticipated there would be an altercation. Additionally, Miller acknowledged he brought Baillie because he knew that Baillie and the victim were not on good terms and "Baillie would back him up if he needed help fighting [the victim]." *Miller*, 2008 WL 1899560 at *1–2.

By contrast, Harry never admitted to having an illegal purpose in going to see the victim, but instead consistently maintained that his sole intent was to retrieve his television. *See, e.g., Holliday v. Poston*, 60 S.C. 103, ——, 38 S.E. 449,

450 (1901) (Gary, J., concurring) (stating the longstanding equitable principle "that if a stranger in possession of my property undertakes to sell it, and delivers it accordingly, it is at my option either to pursue the property in the hands of the holder" or to bring an action to recover the proceeds of the sale). Moreover, none of Harry's alleged accomplices—including Bledsoe and Byrne who were witnesses for the State—testified that Harry expressed or indicated any plan other than to lawfully recover his television.

Viewing the record in the light most favorable the State, I find the evidence at most establishes the following: (1) while he was only a few miles from the victim's home, Harry learned Bledsoe had sold the television to the victim; (2) rather than driving there immediately, Harry drove out of his way to pick up his friend Castro from Byrne's house;[10] (3) Harry and Castro spoke for about 5 minutes in Byrne's house; (4) as Harry was exiting the house, Castro invited Byrne to come along for a ride; (5) Castro retrieved his gun, unseen by either Harry or Byrne; (6) when they arrived at the victim's house, Harry asked for the television and the victim refused to give him the television or any money; (7) Bledsoe began yelling at the victim, accusing him of stealing the television and lying; and (8) Harry attempted to calm Bledsoe and began walking her back to the truck when Castro shot the victim. While the testimony evidenced a plan between Harry and Castro, there is nothing illegal in requesting that a friend accompany you to recover your own property. Indeed, when pressed by the members of this Court at oral argument, the State was unable to articulate what illegal purpose Harry might have had. Instead, the State repeatedly asserted that it is illegal to recover personal property when doing so will result in a breach of the peace. However, this argument assumes, again without any evidentiary basis, that Harry intended or knew a

---

10. The State repeatedly asserted the fact that Harry drove so far out of his way to pick up Castro and Byrne before going to see the victim is evidence Harry anticipated there would be an altercation with the victim and wanted to bring Castro and Byrne as back-up. However, the only testimony regarding why Harry drove all the way to Myrtle Beach first was from Harry himself, in which he testified he was in no rush to pick up the television and he wanted to buy some marijuana from Byrne or Castro, both drug dealers, to smoke with Bledsoe later that evening.

breach of the peace would occur during his interaction with the victim. Moreover, even if Harry *knew* Castro carried a gun, that fact would still not be sufficient circumstantial evidence in my view to establish an illegal purpose.

Based on the record, I find no evidence Harry intended anything more than to retrieve his television nor is there any evidence he was aware of any illegal intent on Castro's part in accompanying him. Therefore, I respectfully dissent because I conclude Harry was entitled to a directed verdict.

**BEATTY, C.J., concurs.**