# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

William C. (Billy) Sellers, Petitioner.

Appellate Case No. 2021-000910

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

Appeal from Edgefield County
Eugene C. Griffith Jr., Circuit Court Judge

Opinion No. 28188
Heard March 30, 2023 – Filed January 17, 2024

## AFFIRMED

Chief Appellate Defender Robert Michael Dudek, of Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, and Senior Assistant Attorney General J. Anthony Mabry, of Columbia; and Solicitor Samuel R. Hubbard III, of Lexington, all for Respondent.

**JUSTICE FEW:** The court of appeals affirmed Billy Sellers' conviction for murder arising from the brutal killing of Johnny Hydrick. We granted Sellers' petition for a writ of certiorari to address two questions. First, did the trial court's jury instruction defining malice in part as "the intentional doing of a wrongful act without just cause or excuse" shift the burden of proof to Sellers to provide justification or excuse for his wrongful acts, or was that portion of the instruction otherwise contrary to law. Second, did the State present evidence to support the trial court instructing the jury as to Sellers' criminal liability under the doctrine of "the hand of one is the hand of all." We affirm the court of appeals.

## I.      Background

Johnny Hydrick—disabled from a car accident—was widely known in his hometown of Trenton, South Carolina, to keep large supplies of Oxycodone on hand to alleviate the pain associated with his disability. Hydrick often illegally sold Oxycodone to others, including Sellers. At trial, the State presented strong evidence Sellers personally murdered Hydrick in his home on October 10, 2014, during the course of burglarizing his home and robbing him of Oxycodone, guns, and cash. A pathologist testified the cause of death was "multiple blunt-force injuries" to the head "due to a beating." While the State's primary theory was Sellers personally beat Hydrick to death,[1] the State presented the alternative theory Sellers was guilty under the doctrine the hand of one is the hand of all because he and a man named "Gee" agreed to carry out the burglary and robbery, during the course of which Gee beat Hydrick to death or did so jointly with Sellers.

The jury convicted Sellers of murder. Because Sellers had a prior conviction from Florida for burglary of a dwelling while armed with a deadly weapon, "an offense that would be classified as a most serious offense" under subsection 17-25-45(C)(1) of the South Carolina Code (Supp. 2023), the trial court was required to sentence him to life in prison without the possibility of parole pursuant to subsection 17-25-45(A)(1) (2014). The court of appeals' opinion affirming the conviction is unpublished. *State v. Sellers*, Op. No. 2021-UP-254 (S.C. Ct. App. filed July 7, 2021).

---

[1] Because the strength of the State's evidence that Sellers personally beat Hydrick to death is not an issue on appeal, we do not discuss most of that evidence.

## II.    Malice Jury Instruction

Sellers contends that, by including the language "the intentional doing of a wrongful act without just cause or excuse" in the definition of malice in its jury charge, the trial court violated his due process rights by shifting the burden to him to prove he acted with just cause or excuse.  We begin our discussion of Sellers' burden-shifting argument by pointing out the trial court gave the jury a thorough and complete instruction on the State's burden of proving "all of the elements, each of them, beyond a reasonable doubt."  Among multiple specific references in its jury charge to the State's burden of proof, the trial court instructed the jury that "to sustain a conviction for murder the State must prove beyond a reasonable doubt . . . the defendant killed another person with malice . . . ."  The trial court then defined malice "as hatred, ill will, hostility toward another person.  It is the intentional doing of a wrongful act without just cause or excuse . . . ."

Under the State's clearly-articulated burden of proof and the trial court's definition of malice, *the State* was required to prove beyond a reasonable doubt that Sellers acted "without just cause or excuse."  Thus, we find the trial court's jury instruction on malice could not have been reasonably interpreted by the jury as shifting the burden of proof to Sellers.  *See Sandstrom v. Montana*, 442 U.S. 510, 517, 99 S. Ct. 2450, 2456, 61 L. Ed. 2d 39, 47 (1979) (analyzing whether a jury instruction violated the Due Process Clause because of improper burden shifting as whether "a reasonable jury could well have interpreted" the instruction to relieve the State of its burden of proof); *see also State v. Bell*, 305 S.C. 11, 19, 406 S.E.2d 165, 170 (1991) (holding a jury instruction defining malice as "the doing of a wrongful act intentionally and without just cause or excuse" was not "an unconstitutional burden-shifting" instruction).

Sellers also argues the malice instruction was "needlessly confusing" and violated "this Court's modern pattern of disapproving of jury instructions on how the jury should interpret certain evidence."  On this point, the court of appeals stated,

> We understand Sellers' argument that a reasonable jury could apply the phrase equating malice with "intentional doing of a wrongful act without just cause or excuse" in problematic ways.  We are not sure what the challenged phrase adds to a malice charge and can see the wisdom in not charging it.  We are also not sure how a wrongful act

can be said to be done with malice if all that is proven is that the act was done with intent . . . . Nor are we sure how an intentional act that is justified or excusable by law could be a crime.

*Sellers*, Op. No. 2021-UP-254, at 2-3.

Instructing a jury on any point of law is difficult, but it can be particularly so on the principle of malice. In some cases, such as where there is evidence the defendant acted in self-defense, it is true the State must prove the defendant acted without just cause or excuse. *See State v. Dickey*, 394 S.C. 491, 499, 716 S.E.2d 97, 101 (2011) (holding "when a defendant claims self-defense, the State is required to disprove the elements of self-defense beyond a reasonable doubt"). Here, however, there was no evidence of self-defense or any other legal justification for the killing of Hydrick. The only question in this case was whether it was Sellers who committed the crime. Thus, like the court of appeals, we question what the phrase "without just cause or excuse" added to the jury's understanding of the legal principle of malice. While we caution our trial courts to carefully consider whether to include any phrase in a jury instruction, however, we do not believe the phrase "without just cause or excuse" in this case could have caused the jury to be confused, nor could have improperly guided the jury on how to interpret specific evidence. We find no error.

In his brief to the court of appeals, Sellers argued for the first time the trial court did not connect the phrase "the intentional doing of a wrongful act" to an act that proximately caused Hydrick's death. He argued the jury instruction could thus lead the jury to conclude the State proved malice merely by showing Sellers engaged in the "wrongful act" of buying or selling drugs, burglarizing Hydrick's home, or robbing Hydrick, unless Sellers showed "just cause or excuse" for those acts. "There was," counsel wrote in his brief to this Court, "a variety of . . . unlawful or wrongful acts that this jury instruction impermissibly called upon [Sellers] to show 'just cause or excuse' for . . . ." At oral argument before this Court, Sellers argued for the first time—in connection with the hand of one is the hand of all—the instruction permitted the jury to find the State proved Sellers' malice merely by showing another person committed one of these wrongful acts.

Neither of these arguments is preserved for appellate review, however, as neither argument was presented to the trial court. *See State v. Field*, 429 S.C. 578, 582, 840 S.E.2d 548, 550 (2020) ("As we have repeatedly held, 'A party need not use the exact

name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground. A party may not argue one ground at trial and an alternate ground on appeal.'" (quoting *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003))).

### III. The Hand of One is the Hand of All Jury Charge

Ordinarily, the State convicts a defendant of a crime by proving that he personally committed the criminal act. As discussed above, the State's primary theory in this case was Sellers committed the murder by personally beating Hydrick to death. Under the doctrine we refer to in South Carolina as "the hand of one is the hand of all," the State proves the defendant guilty by proving he had a mutual plan or agreement with another person to commit one crime, and during the course of committing that initial crime, the other person committed a second crime they had not agreed to commit. *State v. Harry*, 420 S.C. 290, 299, 803 S.E.2d 272, 276 (2017); *see also Butler v. State*, 435 S.C. 96, 97-98, 866 S.E.2d 347, 348 (2021) ("Under the theory the 'hand of one is the hand of all,' when two people join together to commit a crime, and during the commission of that crime one of the two commits another crime, both may be criminally liable for the unplanned crime if it was a natural and probable consequence of their common plan to commit the initial crime."). In this case, the State's alternative theory was that Sellers and Gee mutually planned to burglarize Hydrick's home and rob him of Oxycodone, guns, or cash, and while the two of them were carrying out those initial crimes, either Gee beat Hydrick to death or the two of them mutually beat Hydrick to death.

In most cases in which the State attempts to convict a defendant of murder under the hand of one doctrine, the factual scenario involves a gunshot, not a beating. In such a typical case, two or more people agreed to commit the initial crime, and during the course of that crime a person who is not the defendant shot and killed a victim. This typical scenario is that one of them—not both of them—fired the shot that killed the victim. In cases where the evidence is clear the other person—not the defendant— fired the fatal shot, the hand of one doctrine clearly applies and the trial court will instruct the jury on the doctrine without hesitation. In many cases, however, the evidence is not clear as to one of three points: (1) whether there was a mutual plan or agreement, (2) whether the person who might have fired the fatal shot was part of that plan or agreement, or (3) whether the other person in the plan or agreement is the person who fired the fatal shot. If the evidence is unclear as to any one of these

points, it can be quite difficult for the trial court to determine whether to instruct the jury on the hand of one doctrine.

As to the first point, the trial court must determine whether there is any evidence the defendant had a mutual plan or agreement with another person to commit an initial crime. In *Harry*, for example, the propriety of the hand of one jury instruction depended on whether the State presented evidence the defendant agreed with the others in his group to use illegal force if that force became necessary to retrieve his television. *Compare* 420 S.C. at 300, 803 S.E.2d at 277 (majority concluding "the evidence yielded a reasonable series of inferences . . . that Petitioner devised a plan to retrieve, by force if necessary, his television from Victim" and, "The State therefore presented sufficient evidence that Petitioner was engaged in a scheme to commit an illegal act, the result of which was Victim's shooting death"), *with* 420 S.C. at 301, 803 S.E.2d at 278 (Hearn, J., dissenting) (concluding "the record contains no evidence of an illegal plan").

As to the second point, the trial court must determine whether there is any evidence the other person who might have fired the fatal shot was a person included in the mutual plan or agreement to commit the initial crime. In *State v. Washington*, 431 S.C. 394, 848 S.E.2d 779 (2020), for example, there was evidence another person— Kinloch—joined together with the defendant to harass and assault Manigault (the initial crime), and there was evidence another person—not the defendant—fired the shot that killed Manigault. 431 S.C. at 406-07, 848 S.E.2d at 785-86. But there was no evidence Kinloch fired the shot, 431 S.C. at 409, 848 S.E.2d at 787, and there was no evidence the other person who might have fired the shot was part of the agreement to commit the initial crime, 431 S.C. at 407, 848 S.E.2d at 786. This Court found the hand of one jury instruction should not have been given because "there was no evidence Kinloch shot Manigault," 431 S.C. at 409, 848 S.E.2d at 787, and "Kinloch is the only possible person who could fall into the category of Petitioner's accomplice," 431 S.C. at 407, 848 S.E.2d at 786.

The third point requires the trial court to determine whether there is evidence the defendant fired the fatal shot *and* evidence the person with whom the defendant had a mutual plan or agreement is the person who fired the fatal shot. In *Barber v. State*, 393 S.C. 232, 712 S.E.2d 436 (2011), for example, three witnesses testified the defendant shot two victims, killing one. 393 S.C. at 234-35, 712 S.E.2d at 438. However, the trial court also instructed the jury it may find the defendant guilty on the alternative "hand of one" theory that one of his co-defendants was the gunman.

393 S.C. at 235, 712 S.E.2d at 438. The defendant argued on appeal there was no evidence a co-defendant was the person who fired the fatal shot, and thus the trial court erred by charging the hand of one theory. *See* 393 S.C. at 237, 712 S.E.2d at 439 (stating "the question is whether there is any evidence that another co-conspirator was the shooter").

*Barber* is the classic example of this third type of case because there was evidence the defendant fired the shot, but the question was whether there was also evidence the other person fired the shot. This is the scenario in which we said the "alternate theory of liability may only be charged when the evidence is equivocal on some integral fact." 393 S.C. at 236, 712 S.E.2d at 439. In other words, *Barber* requires the trial court to determine whether—in addition to evidence the defendant fired the shot—there is any evidence the person with whom he agreed to commit the initial crime fired the shot. By stating the evidence must be "equivocal," we simply meant the evidence must support both alternative theories as to which person was the shooter. If all the evidence indicates the defendant was the only shooter, the hand of one theory must not be charged.

This case is unlike *Harry*, *Washington*, and *Barber* because determining whether it was proper to charge the hand of one doctrine here requires addressing all three points—whether there was evidence (1) Sellers mutually agreed with Gee to burglarize Hydrick's home and rob him, (2) Gee participated with Sellers in the burglary and the robbery, and (3) Gee administered a fatal blow to Hydrick during the beating.

We turn, therefore, to the testimony and evidence the State introduced at trial, and begin with the testimony of several inmates Sellers met while incarcerated at the Edgefield County jail awaiting trial. Dennis Amerson testified he did not know Sellers before meeting him during "rec" time when they were let out of their cells for one hour a day. Sellers told Amerson he and two of his friends were "scrapping metal" across the street from Hydrick's house earlier on the day the murder occurred. Sellers told Amerson he tied up the victim and beat him, and that some pills and other items were stolen from the victim. As to the stolen items, Sellers told Amerson "they had got [sic] rid of them."

Phillip Griffin testified he and Sellers were cellmates beginning with Griffin's arrest on November 21, 2014, and Sellers started talking about the charges against him. At first, Griffin testified, Sellers denied he committed the crime. As they continued

talking, however, "His story would change a little bit and he kind of started putting himself involved in the case." Griffin testified Sellers' story "got to the point to where he told me that he actually went out there to commit a robbery," and then "him and a friend . . . drove down Highway 19 to go to the guy's house and they was [sic] going to pull a lick and rob him." Griffin then explained "pull a lick" meant, "They were going to rob him or steal." Sellers told Griffin he knew Hydrick "just got his prescriptions filled and [Sellers] was gonna [sic] go get his pills. If he had any money, [Sellers] wanted it too." Griffin then summarized what Sellers told him,

> They were in his van and they drove down 19 and went close to his house, like an abandoned lot about a hundred, a hundred and fifty yards away from where Johnny lived and that's where they parked and they went to his house. They parked there. They went to his house and they taped him up and was asking him where the pills were and they were pistol-whipping him until he told them where the pills were.

When asked whom Sellers said he was with, Griffin testified Sellers said "a guy named Gee."

Wesley Brown testified he and Sellers were cellmates after Brown was arrested in January 2015. Sellers initially told Brown he had an alibi. Brown testified that after he told Sellers the supposed alibi witness was a close friend of Brown's, "I guess he lightened up a little bit, like he felt like he could trust me a little more." As they continued to talk, Sellers described committing the crime with "some other person" he did not name. Sellers told Brown, "We did it with a .38." Brown also testified Sellers told him that sometime after Hydrick's murder "a guy named Gee" was using Sellers' phone and "while he was using [Sellers'] phone, he was putting text messages or something in his phone, I mean, I guess to make it look like [Sellers] did it."

The State called Jeremy Hembree, an investigator with the Aiken Department of Public Safety, who testified he performed a "phone extraction" to download all the data from Sellers' phone on November 6, 2014, one week after the Edgefield County Sheriff's Department arrested Sellers for Hydrick's murder. Investigator Hembree testified Sellers' phone records showed multiple calls the evening of the murder to a contact in Sellers' phone named Gee. Investigator Hembree testified, however, that

when he did another phone extraction of Sellers' phone just before trial, the "Gee" contact had been deleted, along with all calls and text messages to and from Gee.

We find this evidence supports the trial court's decision to charge the hand of one doctrine to the jury. First, Sellers' statement to Griffin was specific that he and Gee agreed to jointly enter Hydrick's home for the purpose of robbing him. This statement is supported by the fact Sellers made phone calls to Gee just before the crime and deleted Gee's contact information from his phone after he was arrested.

Second, Sellers' statement to Griffin was specific that he and Gee jointly tied up Hydrick and pistol-whipped him to accomplish the robbery. This statement is further supported by Sellers' telling Brown "we" did it with a .38 caliber pistol and his telling Amerson "they" had gotten rid of the items stolen from Hydrick. Thus, there is evidence Gee was part of Sellers' criminal plan.

Finally, as to the third point, unlike in *Barber* and other cases, the State was not required to offer evidence Gee killed Hydrick *instead* of Sellers doing so. Rather, the evidence they jointly beat Hydrick supports the State's position that either one or both of them could have administered the fatal blow or blows. Therefore, the *Barber* idea of "equivocal" evidence—which we applied in *Barber* because the shooting must have been done by one but not both of the co-defendants—is not applicable here. In addition, Sellers told Griffin that when Sellers left Hydrick's home, Hydrick was still alive. This statement clearly supports an inference it was Gee who delivered the final or fatal blows to Hydrick after Sellers left the crime scene.

Thus, if the jury believed Griffin's testimony about what Sellers told him, or if it believed Amerson's and Brown's testimony, then it could find Sellers guilty based on Gee's actions beating Hydrick during the burglary and robbery the two of them agreed to commit without speculating and without having to rely on finding evidence to be not credible. *See Washington*, 431 S.C. at 411, 848 S.E.2d at 788 (reversing because the hand of one charge "invited the jury to speculate"); 431 S.C. at 409, 848 S.E.2d at 787 (holding "an alternate theory of liability may not be charged to a jury 'merely on the theory the jury may believe some of the evidence and disbelieve other evidence'" (quoting *Barber*, 393 S.C. at 236, 712 S.E.2d at 438)).

## IV.    Conclusion

Because the trial court repeatedly instructed the jury on the State's burden of proof, the phrase "intentional doing of a wrongful act without just cause or excuse" did not shift the State's burden of proof or confuse the jury. Because the State presented evidence Sellers agreed with Gee to commit the burglary and robbery and evidence both Sellers and Gee beat Hydrick during the course of the two initial crimes, the hand of one jury instruction was supported by the evidence.

**AFFIRMED.**

**BEATTY, C.J., KITTREDGE, JAMES, JJ., and Acting Justice Stephanie P. McDonald, concur.**