**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Jane Katherine Hughes, Appellant.

Appellate Case No. 2018-000659

Appeal From Greenville County
Perry H. Gravely, Circuit Court Judge

Unpublished Opinion No. 2021-UP-283
Heard December 7, 2020 – Filed July 21, 2021

**AFFIRMED**

Appellate Defender Kathrine Haggard Hudgins, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Assistant Attorney General Caroline Scrantom, all of Columbia, for Respondent.

**PER CURIAM:** Jane Katherine Hughes appeals her convictions for conspiracy to commit murder and the murder of John Michael Ferrell (Victim), her husband.

Hughes asserts the trial court erred in (1) denying her motion for a directed verdict on the conspiracy charge, (2) failing to instruct the jury on the lesser-included offense of assault and battery of a high and aggravated nature (ABHAN), and (3) denying her trial counsel's motion to be relieved. We affirm.

**FACTS/PROCEDURAL HISTORY**

At 11:54 P.M. on January 24, 2015, Hughes called 911 and asked the operator to send officers to her home, where she lived with her two children, her boyfriend Andrew Martin, her parents John Hughes (Father) and Margaret Hughes (Mother), and sometimes her brother Jacob Hughes (Brother). When the first officer arrived, Father was standing outside the front of the home holding a handgun and Victim was lying unresponsive on the ground, bleeding from his head and multiple gunshot wounds. Hughes, Martin, Mother, Brother, and the children were inside the home. Victim was pronounced dead at 12:13 A.M.

On January 28, 2015, Hughes, Martin, Father, Mother, and Brother were arrested. Hughes was indicted for conspiring with Father, Mother, and/or Brother to kill Victim, the murder of Victim, and possession of a weapon during the commission of a violent crime.

On January 5, 2018, Hughes and her appointed counsel (Counsel) appeared before the trial court for a hearing on Counsel's motions for a continuance and to be relieved. Counsel requested the continuance in order to obtain the trial transcript of a previous trial—for which she also had applied for funds due to Hughes's indigent status—and the trial court granted the motion. However, the trial court denied the motion to be relieved as counsel. In April 2018, Hughes and Brother were tried jointly for murder and conspiracy to commit murder, and the following evidence was presented.[1]

In the months preceding Victim's murder, he and Hughes were involved in a custody dispute over their children. Victim and Hughes previously lived in California, and Victim sought enforcement of a California court order giving him custody of the children. Hughes and her parents were extremely worried Victim would receive custody or unsupervised visitation. One witness talked with Hughes, Father, and Mother the night before Victim's murder, and the witness said Hughes was angry and adamant that Victim not get custody of the children. The

---

[1] The State did not go forward with the weapon possession charge.

witness testified Hughes said "I wish he was just gone. Things would be so much easier if he was just gone," and everyone chuckled.

On the night of Victim's murder, Victim and Brother sat in a bar and talked from 8:07 P.M. to 10:35 P.M., and then they went to a restaurant approximately two miles from Hughes's home and talked from 10:49 P.M. until 11:21 P.M. While Brother was with Victim, there were multiple calls and text messages between Father and Brother. At 10:03 P.M., Brother sent Father a text message reading "Call when you're ready for pie."[2] Father replied several times between 10:04 P.M. and 11:10 P.M., stating, "Will do," "Almost," "Just a few minutes," and "Call me." In each of Father's text messages, he ended the message with "green dragons and elm trees" in quotation marks. When Victim and Brother left the restaurant, they drove to Hughes's home.

At Hughes's home, Father told Martin that Victim was coming to talk about the custody dispute, and he asked Martin to wait outside. While he was outside, Martin heard a large crash from inside. When he entered the house, he saw the kitchen table had been overturned and Hughes was standing in the kitchen entryway wielding and swinging a hammer. Father was crouching and pointing a gun at Victim, who was kneeling on the floor and bleeding, and Brother was standing behind Victim. Martin then pulled Hughes into the foyer so she could call the police, and he heard Brother try to tase Victim. Victim tried to escape through the kitchen window, but Brother and Mother grabbed at him to try to prevent his escape while Father ran out the front door. Victim escaped through the window, and Martin heard him begging for his life before Martin heard Father shoot Victim several times. Mother began cleaning the kitchen, and Brother helped before he went to the back of the house. Martin later heard Brother say he broke the taser and flushed it down the toilet. When Martin asked Hughes why she hit Victim with the hammer, she told him she did it to "protect her family" and "because [Father] hesitated." Martin testified Father stated twice that nobody would be in trouble if the police did not find out what happened inside the house, which Martin interpreted as threats.

When officers found Victim, they observed that the bottom of his shirt was ripped and his pants and underwear were around his ankles. Officers found a trail of blood running from Victim's body to the kitchen window, and they found Victim's blood on the kitchen blinds, a hammer and blanket in the kitchen, and Hughes's

---

[2] On the day before Victim's murder, Father sent Brother a text message saying, "Stop on [the] way home, need[] to discuss dessert. 'Revolution is the solution.'"

shirt and pants. Officers discovered nonvisible blood stains on the kitchen floor and table, the foyer wall, the hallway bathroom, and a damp rag found in the kitchen trash can.

At trial, the State played Hughes's 911 call for the jury, in which Hughes tells the 911 operator that Victim broke into the house and was trying to kill her and her children. However, before the 911 operator answered and before Father shot Victim, the call recorded Hughes asking where Victim was and repeatedly saying "you gotta get to him" and "you gotta get him."

The doctor performing Victim's autopsy found at least five gunshot wounds and determined those wounds were the cause of Victim's death. The doctor also noted blunt force trauma on Victim's head and found two different wound patterns, one of which was consistent with the claw side of a carpentry hammer. The doctor testified Victim had been hit with the claw side of the hammer at least four to six times.

The jury found Hughes guilty of murder and conspiracy to commit murder, and the trial court sentenced her to concurrent sentences of thirty years and five years, respectively, with credit for time served. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, appellate courts sit to review errors of law only, and are therefore bound by the trial court's factual findings unless clearly erroneous." *State v. Robinson*, 410 S.C. 519, 526, 765 S.E.2d 564, 568 (2014). An appellate court's review "is limited to determining whether the trial court abused its discretion." *State v. Edwards*, 384 S.C. 504, 508, 682 S.E.2d 820, 822 (2009). "An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *State v. Pittman*, 373 S.C. 527, 570, 647 S.E.2d 144, 166–67 (2007).

## LAW/ANALYSIS

## I. Directed Verdict

Hughes argues the trial court erred in refusing to direct a verdict of acquittal on the conspiracy charge. We disagree.

"In reviewing a motion for directed verdict, the trial court is concerned with the existence of evidence, not with its weight." *State v. Phillips*, 416 S.C. 184, 192, 785 S.E.2d 448, 452 (2016). The trial court must deny a motion for directed verdict when "there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'" *Id.* at 192–93, 785 S.E.2d at 452 (quoting *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000)). "On appeal from the denial of a directed verdict, [appellate courts] view[] the evidence and all reasonable inferences in the light most favorable to the State." *State v. Butler*, 407 S.C. 376, 381, 755 S.E.2d 457, 460 (2014).

Conspiracy is defined as "a combination between two or more persons for the purpose of accomplishing an unlawful object or lawful object by unlawful means." S.C. Code Ann. § 16-17-410 (2015). "The essence of a conspiracy is the agreement. It may be proven by the specific overt acts done in furtherance of the conspiracy but the crime is the agreement." *State v. Buckmon*, 347 S.C. 316, 323, 555 S.E.2d 402, 405 (2001) (citation omitted). "[P]roof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties." *Id.*

We find the trial court did not err in denying the motion for a directed verdict on the conspiracy charge. When viewed in the light most favorable to the State, the text messages between Father and Brother and Father's threatening statements regarding the need to conceal the events occurring inside Hughes's home from the police could lead the jury to "fairly and logically deduce[]" there was a conspiracy to murder Victim. *See Butler*, 407 S.C. at 381, 755 S.E.2d at 460 (stating all evidence is viewed in the light most favorable to the State on appeal from the denial of a directed verdict); *see Phillips*, 416 S.C. at 192–93, 785 S.E.2d at 452 ("[T]he trial court must submit the case to the jury if there is 'any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced.'" (quoting *Mitchell*, 341 S.C. at 409, 535 S.E.2d at 127)). The State also presented evidence indicating Hughes was a part of the conspiracy. Before Father shot Victim outside the house, Hughes's 911 call recorded Hughes telling others "you gotta get to him" and "you gotta get him." The State also showed that Hughes was worried about losing custody of her children to Victim, that she struck Victim multiple times in the head with a carpentry hammer, and that she did so "to protect her family" and "because [Father] hesitated." A jury could find this evidence shows Hughes acted to further the conspiracy by attacking Victim and then directing others to prevent Victim from escaping and to complete the murder. *See Buckmon*, 347 S.C. at 323, 555

S.E.2d at 405 (stating a conspiracy can be proven by acts done in furtherance of the conspiracy).

Because the State presented competent evidence of a conspiracy between Hughes and her family, the trial court did not err in denying her motion for a directed verdict. *See State v. Bostick*, 392 S.C. 134, 139, 708 S.E.2d 774, 776–77 (2011) ("Unless there is a total failure of competent evidence as to the charges alleged, refusal by the trial [court] to direct a verdict of acquittal is not error." (quoting *State v. Irvin*, 270 S.C. 539, 543, 243 S.E.2d 195, 197 (1978))). Accordingly, we affirm the trial court on this issue.

## II.    ABHAN as a Lesser-Included Offense

Hughes argues the trial court erred in failing to charge the jury on ABHAN as a lesser-included offense to murder. We disagree.

"'Murder' is the killing of any person with malice aforethought, either express or implied." S.C. Code Ann. § 16-3-10 (2015). A person commits ABHAN "if the person unlawfully injures another person, and: (a) great bodily injury to another person results; or (b) the act is accomplished by means likely to produce death or great bodily injury." S.C. Code Ann. § 16-3-600(B)(1) (2015). When "there is no dispute the victim died as a result of the battery alleged in the indictment, . . . ABHAN [is] not [a] lesser included offense[] of murder." *State v. Fields*, 314 S.C. 144, 145, 442 S.E.2d 181, 182 (1994).

In the indictment, Hughes was charged with murdering Victim by "shooting him multiple times with a handgun and assaulting him with a hammer." There is no dispute that Victim died of gunshot wounds and that Father fired the shots. The State argued at trial that Hughes was guilty of murder under the doctrine of accomplice liability. *See State v. Harry*, 413 S.C. 534, 540, 776 S.E.2d 387, 390 (Ct. App. 2015) ("The doctrine of accomplice liability arises from the theory that the hand of one is the hand of all." (quoting *State v. Reid*, 408 S.C. 461, 472, 758 S.E.2d 904, 910 (2014))); *id.* at 540, 776 S.E.2d at 391 ("Under this theory, one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose." (quoting *Reid*, 408 S.C. at 472, 758 S.E.2d at 910)); *see also Reid*, 408 S.C. at 472–73, 758 S.E.2d at 910 ("A person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act to be guilty under a theory of accomplice liability.").

As discussed above, there was evidence that Hughes joined with her family to murder Victim and that she participated in Victim's murder. Because it is not disputed that Victim died as a result of one of the batteries alleged in the indictment—i.e., the gunshots—ABHAN is not a lesser-included offense under the facts of this case. *See Fields*, 314 S.C. at 145, 442 S.E.2d at 182 ("[When] there is no dispute the victim died as a result of the battery alleged in the indictment, . . . ABHAN [is] not [a] lesser included offense[] of murder."). Accordingly, the trial court did not err in declining to charge the jury with ABHAN, and we affirm the trial court on this issue.

### III.    Motion to be Relieved

Hughes argues the trial court erred in denying Counsel's motion to be relieved. We disagree.

Whether to grant or deny a motion to relieve counsel rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Gregory*, 364 S.C. 150, 152, 612 S.E.2d 449, 450 (2005). "The movant bears the burden to show satisfactory cause for removal." *State v. Childers*, 373 S.C. 367, 372, 645 S.E.2d 233, 235 (2007). "The mere possibility defense counsel may have a conflict of interest is insufficient to impugn a criminal conviction." *Gregory*, 364 S.C. at 152–53, 612 S.E.2d at 450.

The alleged conflict of interest was Counsel's belief that Hughes or her family pressured several of Counsel's other clients to file grievances against Counsel.[3] Our supreme court has held "the filing of a disciplinary complaint should not result in automatic removal of appointed counsel." *Richardson v. State*, 377 S.C. 103, 107, 659 S.E.2d 493, 495 (2008) (per curiam). The trial court asked Hughes if she coerced Counsel's other clients to file the grievances, and she denied doing so. The trial court noted Counsel's reputation as an excellent criminal attorney and considered Counsel's representation following the grievances. Specifically, the court commended Counsel for requesting both the transcript from a previous trial and the funds for the transcript, stating that many attorneys would not have done the same. The trial court, noting Counsel was in a difficult position if her assertion was true, expressed concern that relieving Counsel "midstream" would be

---

[3] Counsel informed the court that four grievances had been filed, but all were determined to be without merit before the hearing on the motion to be relieved.

detrimental to Hughes.  We find the trial court properly exercised its discretion in denying Counsel's motion.

Furthermore, Hughes has failed to show the trial court's denial prejudiced her as the record shows Counsel's representation was not affected by the grievances.  *See id.* ("[T]he filing of a disciplinary complaint should not result in automatic removal of appointed counsel").  Counsel successfully objected to evidence that would have strengthened the State's case on the conspiracy charge and effectively cross-examined the State's witnesses.  Based on the foregoing, we affirm the trial court's denial of Counsel's motion to be relieved.

**CONCLUSION**

Accordingly, Hughes's convictions are

**AFFIRMED.**

**HUFF, WILLIAMS, and GEATHERS, JJ., concur.**