# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Petitioner,

v.

Devin Jamel Johnson, Respondent.

Appellate Case No. 2023-000131

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Charleston County
R. Markley Dennis, Jr., Circuit Court Judge

---

Opinion No. 28238
Heard May 2, 2024 – Filed October 9, 2024

---

## REVERSED

---

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Melody Jane Brown, Senior Assistant Attorney General William Edgar Salter, III, and Assistant Attorney General William Joseph Maye, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Petitioner.

Appellate Defender Breen Richard Stevens, of Columbia, for Respondent.

---

**JUSTICE FEW:** Today we confront again the question whether a trial court should instruct the jury on the law of accomplice liability in a murder case when the State's evidence is not clear as to whether the defendant personally shot the victim, or another person fired the fatal shot pursuant to a mutual plan or agreement. We recently addressed the same question in *State v. Campbell*, 443 S.C. 182, 904 S.E.2d 441 (2024); *State v. Sellers*, 442 S.C. 140, 898 S.E.2d 116 (2024); *State v. Washington*, 431 S.C. 394, 848 S.E.2d 779 (2020); and *State v. Harry*, 420 S.C. 290, 803 S.E.2d 272 (2017). We hold the trial court was correct to charge accomplice liability in this case. We reverse the court of appeals.

## I.     Facts and Procedural History

Devin Jamel Johnson was convicted for the murder of Akeem Smalls. At trial,[1] a witness testified Smalls stole $1000 worth of marijuana from Johnson in early June 2011. Smalls repaid part of the debt but, as of June 8, still owed Johnson— ironically—$420.[2] Smalls was dating Johnson's sister Sharmaine and was at her

---

[1] This case has been tried three times. In the first trial, the jury found Johnson guilty of murder after the trial court initially refused to instruct the jury on accomplice liability but then changed its mind after the jury asked during its deliberations, "[i]f the other individual pulled the trigger, can the defendant still be guilty?" *State v. Johnson*, 418 S.C. 587, 592, 795 S.E.2d 171, 173 (Ct. App. 2016) (alteration in original). The court of appeals reversed the conviction, holding "the trial court's assurance that it would not instruct the jury on [accomplice liability] . . . [and] the court's subsequent reversal of its earlier ruling . . . rendered the trial fundamentally unfair." 418 S.C. at 590, 795 S.E.2d at 173. This Court denied the State's petition for a writ of certiorari to review the court of appeals' 2016 decision. A second trial ended in a mistrial for reasons not reflected in the record before us. In the third trial, the trial court instructed the jury on accomplice liability and the jury convicted Johnson of murder a second time. The court of appeals again reversed, finding the trial court "erred in giving the accomplice liability jury charge." *State v. Johnson*, 438 S.C. 110, 128, 882 S.E.2d 190, 199 (Ct. App. 2022). This time we granted the State's petition for a writ of certiorari to review the court of appeals' 2022 decision.

[2] The Urban Dictionary—a crowdsourced online dictionary for slang words and phrases—contains multiple user-submitted definitions of the term "420." According to one definition,

> [T]he term 420 originated at San Rafael High School
> [CA], in 1971, among a group of about a dozen pot-

apartment in Charleston late that night.  Surveillance video from the apartment complex showed that at approximately 10:15 p.m., a blue 2008 Toyota Camry with a missing hubcap and a unique license plate drove into the parking lot and backed into a parking space.  The video shows two men getting out of the car at 10:17 and hurriedly walking together into a breezeway leading to Sharmaine's building.  Two minutes later, the video shows the same two men coming out of the breezeway, hurrying back to the car, and quickly driving off.  Moments after that, the video shows Smalls running out of the breezeway and entering another building.  Smalls had been shot, and he later died from a gunshot wound.  After denying during four hours of questioning that he was the driver of the Camry, and claiming he was in Orangeburg that night and not in Charleston, Johnson eventually admitted he was the driver of the Camry shown in the surveillance video.  Johnson claimed the passenger in the Camry was a man named "Creep."  Creep has never been identified.

The State presented extensive evidence at trial to corroborate Johnson's admission and demonstrate his involvement in the murder.  The same witness who testified Smalls stole $1000 worth of marijuana from Johnson testified Johnson "was looking for" Smalls.  Police found an unfired 9mm FC Luger bullet cartridge—the same type of bullet that killed Smalls—in Sharmaine's apartment with Johnson's fingerprint on it.  Police found Johnson's fingerprints inside the Camry, which belonged to Johnson's girlfriend.  An analysis of cell-site location information taken from Johnson's cell phone records showed that, though Johnson was in the Summerville

---

smoking wiseacres who called themselves the Waldos . . . . The term was shorthand for the time of day the group would meet, at the campus statue of Louis Pasteur, to smoke pot.  Intent on developing their own discreet language, they made 420 code for a time to get high, and its use spread among members of an entire generation.

*420*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=420 (last visited Aug. 8, 2024).

The Urban Dictionary permits its readers to vote whether they approve or disapprove of the various definitions.  This definition of 420 has received 36,101 "thumbs up" votes, three times as many as any other definition.  *Id*.

area earlier in the day, he was in Charleston in the vicinity of the murder at the time it occurred.[3]

Sergeant Craig Kosarko testified Johnson's cell phone records also showed he engaged in a text message conversation on June 8 with a man named Terry Stevens in which they initially exchanged messages about what they were doing that day and the possibility of meeting up after Stevens got off work. Around 12:30 p.m., Johnson texted Stevens he needed help with something but he did not say what. At 4:37, Johnson texted Stevens, "Ay I go wet dude ass up da night." Numerous witnesses—from law enforcement officers to street-level drug dealers and users—testified that to "wet up" a person means to shoot them or otherwise make them bleed because "their clothes get wet from the blood."[4]

Sergeant Kosarko testified Johnson texted Stevens at 4:39, "Im bout dat 5 wa time u get off" and at 4:44, "Yea i go take u bac to da chuck." Kosarko then explained "da chuck" means "Charleston," where Sharmaine's apartment was located. At 8:33, Johnson texted Stevens, "Jus bring yo ass down here," and at 8:59, "I need u when u go b hm?" Kosarko testified "the last thing Devin Johnson texted to Terry Stevens on June 8" was at 9:34, when Johnson wrote, "I cnt wait on u i gotta handle my bizz." Forty-one minutes later, Johnson and the unknown "Creep"—whom nobody suspects was Stevens—drove into the parking lot at Sharmaine's apartment.

Johnson's cell phone records also showed that between 9:01 and 10:02 that night he made ten phone calls to Stevens, Sharmaine, and his mother. In two of those calls—both around 9:30—he called Sharmaine but blocked her from being able to see who was calling. That was four minutes before he texted Stevens saying he could not wait and said "i gotta handle my bizz." Between 10:02 and 10:35 he made or

_____

[3] *See State v. Warner*, 436 S.C. 395, 398 n.1, 872 S.E.2d 638, 639 n.1 (2022) (explaining that cell phones "tap into the wireless network several times a minute" and that contact "generates a time-stamped record known as cell-site location information" that can show the location of the phone) (quoting *Carpenter v. United States*, 585 U.S. 296, 300-01, 138 S. Ct. 2206, 2211, 201 L. Ed. 2d 507, 515 (2018)).

[4] The phrase "wet up" is defined in the Urban Dictionary as, "To shoot or (sometimes stab) a person several times, usually in an attempt to murder them. Called 'wet up' because there is enough blood to soak their clothes, leaving them 'wet'." *wet up*, Urban Dictionary, https://www.urbandictionary.com/define.php?term=wet%20up (last visited Aug. 8, 2024).

received no calls. The murder took place at 10:18. Sharmaine called Johnson at 10:35, and between then and 11:40, Johnson made or received eleven other calls to or from Stevens, Sharmaine, his mother, and others. His cell-site location information showed he returned to Summerville shortly after the murder occurred.

The State indicted Johnson for murder and possession of a weapon during the commission of a violent crime. The jury found him guilty of murder but not guilty of possession of a weapon. The court of appeals reversed the murder conviction because it found "the State presented no evidence Johnson acted in concert with another" and "no evidence was presented of Creep being the shooter." *State v. Johnson*, 438 S.C. 110, 124, 129, 882 S.E.2d 190, 197, 200 (Ct. App. 2022). Thus, the court of appeals held, the trial court erred by instructing the jury on the law of accomplice liability. *Id.* We disagree with the court of appeals.

## II.    Accomplice Liability

The State presented convincing evidence to support a finding that Johnson murdered Smalls. A witness testified Smalls stole $1,000 of marijuana from Johnson and Johnson was "looking for" Smalls. Johnson's text conversation with Stevens shows he spent much of the day on June 8 attempting to get Stevens to help him murder Smalls. The jury could infer that when Johnson blocked his number to make the 9:30 calls to Sharmaine he was calling to find out if Smalls was at her apartment. His 9:34 text to Stevens indicates his intention to proceed with his plan without Stevens. Johnson admitted he was driving the Camry that showed up at Sharmaine's apartment at 10:15 with an unknown person in the passenger seat. Police found an unfired bullet cartridge—the same type of bullet that killed Smalls—in Sharmaine's apartment with Johnson's fingerprint on it.

These facts make out an unassailable case for murder—with one exception: the State could not conclusively prove it was Johnson who pulled the trigger to shoot and kill Smalls. The State argues that under the theory of accomplice liability, however, it does not matter. We agree.

We begin by stressing that the question before us is not whether Creep can be guilty as an accomplice if Johnson shot Smalls, but whether Johnson can be guilty as an accomplice if Creep shot Smalls. If Johnson was the shooter, he was clearly guilty of murder as the principal and there is no need for any discussion of accomplice liability. The accomplice liability question arises only on the possibility that Creep was the shooter instead of Johnson. Thus, the narrow question before us is whether a reasonable inference could be drawn from the evidence that Creep shot Smalls

pursuant to a plan or agreement with Johnson. We hold the evidence reasonably supports that inference.

As we stated in *Sellers*, "Ordinarily, the State convicts a defendant of a crime by proving that he personally committed the criminal act." 442 S.C. at 148, 898 S.E.2d at 120. The law of accomplice liability provides, however, that a person may be guilty of a crime even though he did not personally commit the criminal act. *See State v. Crowe*, 258 S.C. 258, 265, 188 S.E.2d 379, 382 (1972) (holding a defendant who did not shoot the victim but was acting in concert with the shooter was "as guilty as the one who committed the fatal act"). In a murder case, for example, if two people plan or agree to commit the murder, and both of them are present at the scene of the crime, but only one of them actually shoots and kills the victim, both participants in the plan or agreement are nevertheless guilty of the murder. *State v. Langley*, 334 S.C. 643, 648-49, 515 S.E.2d 98, 100-01 (1999). Thus, in a murder case involving a gunshot, the trial court should charge the law of accomplice liability when there is any evidence (1) the defendant had a mutual plan or agreement with another person to commit the murder, and (2) the other person in the mutual plan or agreement fired the fatal shot. *See Washington*, 431 S.C. at 407, 848 S.E.2d at 786 (holding it was error to give an accomplice liability charge when—though there was evidence the defendant had a mutual plan with another person and evidence that another person fired the fatal shot, there was no evidence the other person who might have fired the shot was part of the mutual plan); *Barber v. State*, 393 S.C. 232, 236-37, 712 S.E.2d 436, 439 (2011) ("[T]he question is whether there is any evidence that another co-conspirator was the shooter and Barber was acting with him when the [crime] took place.").[5] In this case there is evidence of a mutual plan or agreement and that Creep fired the fatal shot pursuant to that plan or agreement.

---

[5] This case is different from *Washington*, *Barber*, *Sellers*, and *Harry* in that those cases involved an alleged mutual plan or agreement to commit a crime other than murder, and the State claimed one participant in the plan killed the victim during the commission of the other crime. This case is like *Langley* and *Crowe* in that the State's alleged mutual plan or agreement was to commit the murder itself. The difference does not matter, however, because the accomplice liability theory is almost the same in both situations. The only difference between the two situations— not applicable in this case—is that when the plan or agreement is to commit a crime other than murder, the State must prove the murder "was a natural and probable consequence of their common plan to commit the initial crime." *Butler v. State*, 435 S.C. 96, 97-98, 866 S.E.2d 347, 348 (2021) (citing *Harry*, 420 S.C. at 299, 803 S.E.2d at 276).

First, there is evidence Johnson had a plan or agreement with Creep to murder Smalls. The evidence to support the agreement begins with the testimony that Johnson was angry with Smalls and looking for him. Johnson told Stevens he planned to "wet up" Smalls, which the evidence indicates means Johnson planned to shoot and kill Smalls. Johnson clearly did not want to murder Smalls by himself, as indicated by his repeated attempts to recruit Stevens to be his accomplice. Despite Stevens's refusal, however, the evidence clearly indicates Johnson held to his plan, as demonstrated by his text message to Stevens, "I cnt wait on u i gotta handle my bizz." Forty-one minutes later, Johnson and Creep arrived together in the parking lot at Sharmaine's apartment. They sat in the car for two minutes—plenty of time to finalize their plan—then ran into Sharmaine's apartment, and two minutes later, they returned to the car together and sped off. All of this evidence clearly supports an inference that Johnson and Creep carried out their nefarious escapade by mutual plan or agreement. While the evidence of their mutual plan or agreement is all circumstantial, it is a classic accomplice liability scenario. *See Campbell*, 443 S.C. at 193, 904 S.E.2d at 446 ("Accomplice liability can be proven by circumstantial evidence.").

Second, there is evidence Creep was the shooter because the evidence conclusively indicates either Johnson or Creep fired the shot that killed Smalls. The lack of evidence of which one did it, in this unique case, is evidence that each of them did it. The two arrived together after Johnson failed to recruit Stevens to join him in murdering Smalls. Two minutes after the two entered the breezeway, they quickly ran back to the Camry and drove off. If it was not Johnson, it was clearly Creep, and visa versa.

This takes us back to whether there is evidence of a mutual plan or agreement. On one hand, if Johnson was the shooter, it makes some sense to conclude that Creep knew nothing about what Johnson planned to do. On the other hand, however, if Creep was the shooter, the inference that they acted in concert is unmistakable. *See Campbell*, 443 S.C. at 195, 904 S.E.2d at 447 (addressing a similarly "remarkable" coincidence of facts in that case and stating, "We simply cannot ignore evidence of the arrival of two men outside the same apartment building at the same moment before dawn, both armed with rifles and firing into the same apartment"). As in *Campbell*, the "remarkable fact" that Johnson spent the day planning his murder of Smalls and then the person with him pulls the trigger to accomplish the crime "is undeniable circumstantial evidence of two people acting as accomplices." *Campbell*, 443 S.C. at 194-95, 904 S.E.2d at 447 (internal quotation mark omitted).

Thus, we hold the evidence supported the trial court's decision to charge accomplice liability.

As a final point, the State argues we need to clear up a statement this Court made in *Barber* that "an alternate theory of liability may only be charged when the evidence is *equivocal* on some integral fact." 393 S.C. at 236, 712 S.E.2d at 439 (emphasis added). We agree our courts are misinterpreting the word "equivocal," but there is nothing wrong with *Barber*. In *Sellers*, we explained "three points" on which difficulty may arise for a trial court deciding whether to instruct the jury that a person who did not commit the act of murder may nevertheless be guilty under an accomplice liability theory. 442 S.C. at 148-50, 898 S.E.2d at 120-21. "The third [*Sellers*] point requires the trial court to determine whether there is evidence the defendant fired the fatal shot *and* evidence the person with whom the defendant had a mutual plan or agreement is the person who fired the fatal shot." *Id.* As we explained in *Sellers*, "*Barber* is the classic example of [the] third [*Sellers* point] because there was evidence the defendant fired the shot, but the question was whether there was also evidence the other person fired the shot." *Sellers*, 442 S.C. at 150, 898 S.E.2d at 121.

The readers of *Barber*, however, are making too much of the word "equivocal." First, the *Barber* statement applies only to the question actually addressed in *Barber*, which is the third *Sellers* point. The idea of "equivocal" evidence has no application when a trial court is considering the first two *Sellers* points, "(1) whether there was a mutual plan or agreement, [or] (2) whether the person who might have fired the fatal shot was part of that plan or agreement." 442 S.C. at 148-49, 898 S.E.2d at 121. As to the third *Sellers* point, "By stating the evidence must be 'equivocal,' [the *Barber* Court] simply meant the evidence must support both alternative theories as to which person was the shooter." *Sellers*, 442 S.C. at 150, 898 S.E.2d at 121; *see id.* ("If all the evidence indicates the defendant was the only shooter, the [accomplice liability] theory must not be charged."). Under *Barber*, therefore, as explained with the third point of *Sellers*, there must be some evidence to support a finding the defendant fired the shot, but there must also be some evidence to support a finding the accomplice fired the shot.[6] Here, as we have explained, there is evidence of both things.

---

[6] In *Sellers* and *Barber*, the State pursued alternative theories of the defendant's guilt for murder. The State's primary theory was based on evidence the defendant personally fired the fatal shot (*Barber*) or administered the fatal blow (*Sellers*). The alternative theory was the defendant's accomplice killed the victim. The question in both cases was whether there was evidence to support the alternative theory of

Just as with *Barber*, the readers of *Sellers* should not make too much of the "three points."  In both instances, we were attempting to explain our ruling in that unique case.  While we believe both the "equivocal" point from *Barber* and the "three points" from *Sellers* are helpful in analyzing all situations in which the issue is whether a trial court should instruct the jury on accomplice liability, each case is different and must be analyzed on its own facts.  We were not in either *Barber* or *Sellers* attempting to handcuff trial and appellate courts or otherwise change the law.

### III.    Conclusion

We hold the trial court was correct to charge accomplice liability.  We reverse the court of appeals and reinstate Johnson's conviction for murder.

**REVERSED.**

**KITTREDGE, C.J., and JAMES, J., concur.  HILL, J., dissenting in a separate opinion in which Acting Justice Donald W. Beatty, concurs.**

---

accomplice liability.  Thus, when we made the quoted statement in *Barber*, and when we identified the "third point" in *Sellers*, we acknowledged the existence of evidence the defendant personally killed the victim, and were addressing only whether there was also evidence the accomplice was the person who killed the victim.  *See Barber*, 393 S.C. at 236, 712 S.E.2d at 439 ("We find the sum of the evidence presented at trial . . . was equivocal as to who was the shooter."); *Sellers*, 442 S.C. at 153, 898 S.E.2d at 123 (reciting evidence that "clearly supports an inference it was [the accomplice] who delivered the final or fatal blows").  In both cases, therefore, we found the accomplice liability jury instruction was appropriate because there was evidence of both things.  There are cases, however, in which the *Barber* "equivocal" statement and the "third point" of *Sellers* do not apply at all, such as where the State proceeds only on the theory that the defendant's accomplice fired the fatal shot.  *See Sellers*, 442 S.C. at 148, 898 S.E.2d at 120 ("In cases where the evidence is clear the other person—not the defendant—fired the fatal shot, the [accomplice liability theory] clearly applies . . . .").

**HILL, J., dissenting:**

With great respect for the majority, I dissent. I agree with the majority that there was ample evidence Johnson murdered Victim and that he attempted to recruit Stevens as an accomplice to help him commit the murder. However, I dissent because I do not believe there was evidence that Creep and Johnson entered into a mutual plan or agreement to murder Victim or that Creep shot Victim. I would therefore hold there was no evidence to support the accomplice liability charge in this case.

The only evidence of Creep's involvement was Johnson's statement to police that he went to the Georgetown Apartments with Creep and the surveillance video of Johnson and Creep arriving at the apartments minutes before the shooting, leaving the car, and then returning to the car after the murder. Creep's mere presence at the apartment with Johnson at the time of the murder is not enough evidence to allow a jury to find Creep was Johnson's accomplice. *See State v. Reid*, 408 S.C. 461, 472–73, 758 S.E.2d 904, 904 (2014) ("A person must personally commit the crime or be present at the scene of the crime and intentionally, or through a common design, aid, abet, or assist in the commission of that crime through some overt act to be guilty under a theory of accomplice liability. Accordingly, proof of mere presence is insufficient, and the State must present evidence the participant knew of the principal's criminal conduct."); *see also State v. Scott*, 224 S.E.2d 185, 190 (N.C. 1976) (providing a person's "mere presence plus friendship" with the defendant is not "sufficient evidence for a jury to convict upon an aiding and abetting theory"; instead, "the friendly bystander [must h]ave knowledge that his presence will be regarded by the perpetrator as encouragement" to commit the crime); *State v. Irby*, 423 S.W.2d 800, 803 (Mo. 1968) ("Presence of the accused immediately before the commission of a felony is evidence 'to be considered in determining whether he was guilty of aiding and abetting, but in order to aid and abet another in the commission of a crime something more than mere presence must be shown. It is necessary that the accused 'associate himself with the venture' in some fashion; that some form of affirmative participation be shown—participation in the crime as something that he wished to bring about; that he sought by his action to make it succeed; that he 'consciously shared' in the criminal act." (internal citations omitted)).

As this case demonstrates, it is no surprise that in dealing with accomplice liability, "courts have experienced considerable difficulty in cases where the defendant was present at the time of the crime and the circumstances of his presence suggest that he might be there pursuant to a prior agreement to give aid if needed." 2 Wayne R. LaFave, *Substantive Criminal Law* § 13.2(a) (3d ed. 2023). The courts' struggle to

define the proper limits of accomplice liability "has led exasperated commentators to describe the law of accomplice liability as 'vexing,' 'a disgrace,' 'extraordinarily difficult,' a 'Gordian knot,' and a scene of 'chaos.'"  Charles F. Capps, *Rethinking Accomplice Liability*, 56 Ariz. St. L.J. 1, 3 (2024) (internal citations and footnotes omitted).  The difficulty is compounded in this case because this appeal concerns the propriety of a jury charge rather than the review of a denial of the defendant's directed verdict motion.  The evidence presented by the State easily satisfies the directed verdict standard as to murder; it does not support a jury charge on accomplice liability.

As the majority emphasizes, there is abundant evidence Johnson unsuccessfully attempted to get Stevens to be his accomplice.  No similar evidence exists as to Creep.

The majority concludes the evidence proves there was a mutual plan or agreement because "if Creep was the shooter, the inference that" he and Johnson "acted in concert is unmistakable."  No evidence shows that Creep was the one who shot Victim or that he was even armed the night of Victim's murder.  The lack of evidence as to who shot Victim is not evidence Creep shot Victim.  At least in the context here, the absence of evidence is not evidence.  This is akin to saying a theory must be true because there is no evidence proving that it is false.  Like the majority, I agree that "if Johnson was the shooter, it makes sense to conclude that Creep knew nothing about what Johnson planned to do."  But there is no evidence Creep shot Victim, or otherwise actively participated in the shooting.  We are therefore allowing the jury to roll the dice and gamble that Creep and Johnson had a mutual plan or agreement to murder Victim.

It is true that proof of the mutual plan necessary to justify an accomplice liability charge may be, and often is, highly circumstantial.  Accomplices do not tend to memorialize their criminal schemes in writing.  But there still must be some evidence suggesting the plan existed.  To be sure, this evidence may consist of inferences.  Coincidences, though, do not always produce sound inferences.  At least in my view, it is not logically sound to infer that an event was caused by a plan between X and Y simply because the event occurred when X and Y were together.  This should not be used as a substitute or short cut to prove the existence of a plan.  That would be the end of mere presence and the beginning of a dragnet approach to accomplice liability.  In my view, the majority opinion as well as the decision in *State v. Campbell*, 443 S.C. 182, 904 S.E.2d 441 (2024), represent a departure from *Reid* and other accomplice liability precedent.

There is some relationship between the law of accomplice liability and the doctrine of third-party guilt. Under the third-party guilt doctrine, the evidence that a criminal defendant may elicit to show another person committed the crime is "limited to such facts as are inconsistent with his own guilt, and to such facts as raise a reasonable inference or presumption as to his own innocence[.]" *State v. Gregory*, 198 S.C. 98, 104, 16 S.E.2d 532, 534 (1941). Therefore, we have held evidence that does nothing but "cast a bare suspicion upon another, or . . . raise a conjectural inference as to the commission of the crime by another, is not admissible." *Id*; *see also Holmes v. South Carolina*, 547 U.S. 319, 328–30 (2006).

With today's decision, a curious asymmetry now exists in our law. The State is allowed to put a defendant on trial as a principal, elicit evidence that someone else was present at the scene, and argue the defendant is guilty as an accomplice if there is even a "bare suspicion" or "conjectural inference" that the other person could have committed the crime. This suspicion, in turn, is enough to permit the jury to find a mutual plan was in place. Yet, the third-party guilt doctrine would bar a defendant from admitting the same type of evidence to suggest another person committed the crime. *See Holmes*, 547 U.S. at 330 (the point behind the third-party guilt rule is to "exclud[e] evidence that has only a very weak logical connection to the central issues" of the case).

In sum, evidence of a plan or agreement to commit a crime is needed to entitle the State to an accomplice liability jury charge. That evidence was not present in this case. *See, e.g.*, *Jackson v. State*, 897 S.E.2d 785, 798 (Ga. 2024) (affirming defendant's conviction of battery under accomplice liability theory because although the evidence was unclear whether the defendant or another person struck victim causing him to fall to the ground, there was also evidence defendant later joined in further attacking and shooting the victim; therefore, there was sufficient evidence from which the jury could infer more than defendant's mere presence). I would therefore affirm the court of appeals' finding that the trial court abused its discretion in charging the jury on accomplice liability.

**Acting Justice Donald W. Beatty, concurs.**